## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **ANTHONY EWELL,** | Civ. No. 11-5107 (KM)(SCM) |
| **Plaintiff,** | **OPINION** |
| **v.** | |
| **NBA PROPERTIES, INC.; MICHAEL GLIEDMAN; AND JOHN DOE CORPORATIONS,** | |
| **Defendants.** | |

The plaintiff, Anthony Ewell, was fired from his job as a project manager in the information technology department of defendant NBA Properties, Inc. NBA Properties says it terminated Mr. Ewell because, while traveling on business, he behaved irresponsibly at a bar and missed work the following morning. Ewell contends that NBA Properties fired him on a pretext; the real reason, he says, was his race. The defendants have filed a motion for summary judgment. The motion will be granted as to all counts.

### Background

Anthony Ewell worked in the IT department for NBA Properties, Inc. (an entity related to the National Basketball Association). (NBA Stmt., ¶¶ 1-2).[1] He

_____

[1] References to the record will be abbreviated as follows:

"Case Dep." – Deposition of Garth Case, Dkt. No. 81-1, Exh. E.

"Chandler Dec." – Declaration of Kerry Chandler, Dkt. No. 72-3

"Compl." – Second Amended Complaint, Dkt. No. 26.

"Employee List" - Declaration of Anthony S. Almeida, Dkt. No. 82-1, Exh. G.

"Ewell Dep." – Deposition of Anthony Ewell, July 25, 2012, Dkt. No. 72-6, Exh. 1.

worked for NBA Properties from 1996 to 2010, and received positive performance evaluations. (Ewell Brief, 3).

On June 24, 2010, NBA Properties terminated Mr. Ewell. (Case Dep., 86-87). At the time, a representative of the organization told Ewell that he was being terminated because of his actions at a bar in Boston while traveling for an NBA event. (*Id.* 97).

In June 2010, NBA Properties sent Mr. Ewell from his usual office in Secaucus, New Jersey, to Boston. His assignment was to assist in issuing press credentials at the NBA Finals, the national championship series that culminates the NBA season.

On the evening of June 9, 2010, after finishing his shift, Mr. Ewell went to a Boston bar to hear a performance by a band. (Ewell Brief, 6). One member of the band was defendant Michael Gliedman, who was the Chief Information Officer of NBA Properties and hence the head of Ewell's department. (*Id.* at 6; NBA Brief, 1). Several other NBA employees were in attendance. (Ewell Dep., 177).

After Gliedman's band finished its set, Ewell and other NBA employees moved to a second bar. There they remained until closing time, around 2:00 a.m. Ewell drank alcohol over the course of the evening. (Case Dep., 90). Asked in his deposition whether he was drunk when the bar closed, he responded, "I had no more, no less, probably, than most people and other individuals at that

---

"Ewell Stmt." – Plaintiff's Statement of Material Facts not in Dispute, Dkt. No. 79-1.

"Ewell Supp. Stmt." – Plaintiff's Supplemental Statement of Disputed Material Facts, Dkt. No. 79-2.

"Loughery Dep." – Deposition of Jack Loughery, Declaration of Elise M. Bloom, Exh. 8, Dkt. No. 72-13.

"Mot." – Memorandum of Law in Support of Defendants' Motion for Summary Judgment, Dkt. No. 72-1.

"NBA Stmt." – Statement of Material Undisputed Facts...In Support of Defendant's Motion for Summary Judgment, Dkt. No. 72-2.

"Reply Stmt." – Defendants' Response to Plaintiff's Supplemental Statement of Disputed Material Facts, Dkt. No. 84-1.

"Rios Dep." – Deposition of John Rios, Declaration of Anthony S. Almeida, Dkt. No. 82-1, Exh. F.

bar." (Ewell Dep., 194). He elsewhere described his state as not "overly inebriated." (Case Dep., 90).

A bartender presented Mr. Ewell with the check; Ewell believed the charges were too high. He therefore "commenced a debate with the bartender and a waitress regarding the credit card bill." (Ewell Supp. Stmt., ¶ 36). The outcome of that debate was that two bouncers "grabbed each of Plaintiff's arms," punched him and "assaulted him very severely." (*Id.* at ¶¶ 37-40). Ewell was "knocked out" and "laid out" on the floor, a "massive amount of blood" flowing from his mouth and face. (*Id.* at ¶¶ 41-42). Physically thrown out of the bar, he chipped his tooth on the sidewalk. (NBA Stmt, ¶¶ 20-22; Ewell Stmt., ¶¶ 20-22). Three of Ewell's colleagues went outside, where a police officer told them that if they did not remove Ewell, the officer would do so himself. (*Id.* at ¶¶ 24-25). Four of Ewell's colleagues then took him to a local hospital. (*Id.* at ¶ 26). The hospital treated Ewell's injuries and released him at approximately 4:00 a.m. *Id.*[2]

Mr. Ewell was scheduled to report to work at 8:45 a.m., but he remained asleep in his hotel room. (Ewell Dep., 203-04). In his deposition he explained that he had "wounds all the way around my face," a chipped tooth, and "blood all over my face"; in short, he was in "no condition to work." (*Id.* at 204-05). "Even if I could have gotten up at 8:45 to make my way…it wouldn't have been in the best interest to show up in the media trailer in front of NBA media," Ewell explained. (*Id.* at 204). "[O]bviously, clearly, there would be some – a lot of questions if I showed up beat up in NBA Properties media trailer." (*Id.* at 206).

The person in charge of scheduling employees for the credentials operation had accompanied Mr. Ewell to the emergency room and was therefore aware of his condition. (Ewell Dep., 204). Ewell nonetheless received

---

[2]     Ewell states that he was unable to find an attorney who would help him bring any legal action against the bar itself. (Ewell Dep., 198, 203).

numerous phone calls from NBA personnel that morning. (*Id.* at 205). Despite his condition, Ewell did offer to come in to work. (*Id.* at 206).

Mr. Ewell's supervisors eventually decided that he should not report to work at all on June 10, 2010, or indeed for the remainder of the NBA championship series in Boston. (Ewell Dep., 207). They directed Ewell to return to New Jersey, and arranged for a substitute to travel from New Jersey to Boston. (*Id.* at 208-209).

Two weeks later, on June 24, 2010, Mr. Ewell's direct supervisor, Garth Case, informed him that he was being terminated.[3] NBA Properties explains that it terminated Ewell because his actions in Boston violated the league's Employee Conduct Policy. (Mot., 1). That policy prohibits employees from "[e]ngaging in any acts that the NBA considers…contrary to its interests." (*Id.* at 3; copy of policy at 72-4). The decision to terminate Ewell was made by the Chief Information Officer of NBA Properties, Michael Gliedman. (Ewell Stmt., ¶ 37).

**The Complaint**

Mr. Ewell filed this action on September 2, 2011. The complaint[4] contains six counts: The first count (they are not numbered) alleges that NBA Properties and Mr. Gliedman subjected Mr. Ewell to discrimination in the workplace and ultimately fired him in violation of Title VII of the Civil Rights Act. The third count makes a parallel claim under the New Jersey Law Against Discrimination ("NJLAD"). The second count alleges that NBA Properties and Gliedman retaliated against Mr. Ewell for complaining about discrimination in

---

[3]    NBA Properties represents that, during that June 10-24 interim, it conducted an investigation, interviewing some ten witnesses. (NBT Stmt ¶32; Chandler Dec., Dkt No. 72-3 ¶6)) Plaintiff contests this as being based on hearsay. The Affiant, Ms. Chandler, is Executive Vice President of Human Resources and would be in a position to know if the investigation occurred. For current purposes, I do not find it necessary to rely on the contents of the investigation.

[4]    The "complaint" referred to herein is the Second Amended Complaint (Dkt. No. 26).

the workplace, in violation of Title VII. The fourth count makes a parallel claim under the NJLAD. The fifth and sixth counts allege that the same discriminatory conduct constituted intentional and negligent infliction of emotional distress.

This Court has subject matter jurisdiction over Mr. Ewell's Title VII claims pursuant to 28 U.S.C. § 1331. The Court will assert pendent jurisdiction over Mr. Ewell's state law claims, which are part of the same case or controversy. *See* 28 U.S.C. § 1367(a).

## **Discussion**

NBA Properties and Mr. Gliedman have moved for summary judgment as to all claims. To prevail on summary judgment, the moving party must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The court must construe the facts and inferences in the light most favorable to the nonmoving party. *Boyle v. County of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998). A mere "scintilla" of evidence to support the non-moving party's position is not enough to defeat summary judgment. Rather, there must be "evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The non-moving party must make a factual showing; it cannot create a material issue of fact by means of conclusory statements. *See Ridgewood Bd. of Ed. v. N.E.*, 172 F.3d 238, 252 (3d Cir. 1999).

I find that Mr. Ewell has not presented evidence sufficient to support a jury finding in his favor. The defendants' motion for summary judgment will therefore be granted.

## I.    Wrongful Discharge Claims

The first and third counts of the complaint allege that Mr. Ewell suffered discrimination on the basis of his race and color, culminating in his dismissal, in violation of Title VII and the NJLAD.

### A.    Standard of proof – *McDonnell Douglas*

Courts evaluate motions for summary judgment on Title VII and NJLAD claims under a specialized burden-shifting regime. For Title VII claims, courts follow the framework set out in the Supreme Court's decision in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). For discrimination claims under the NJLAD, courts likewise use the *McDonnell Douglas* framework, at least where the plaintiff's case rests on circumstantial evidence. *Bergen Commercial Bank v. Sisler*, 157 N.J. 188, 209, 723 A.2d 944, 954 (1999).[5]

*McDonnell Douglas* divides the burden of production into three phases, shifting the burden between the plaintiff and the defendant.

---

[5]    Ewell has presented only circumstantial evidence of discrimination. Where the plaintiff proffers direct evidence, the standard is slightly different: "[T]he quality of evidence required to survive a motion for summary judgment is that which if believed, proves [the] existence of [a] fact in issue without inference or presumption." *Sisler*, 723 A.2d 944, 954 (N.J. 1999). *See also Pray v. New Jersey Transit, Inc.*, No. A-3831-12T3, 2014 WL 684592, at *10 (N.J. Super. Ct. App. Div. Feb. 24, 2014) (drawing this distinction); *Kirschling v. Atl. City Bd. of Educ.*, 10 F.Supp.3d 587 (D.N.J. 2014) (same).

**Step 1: *The Prima Facie Case.*** At the outset, the plaintiff must state a prima facie claim of discrimination. *Burton v. Teleflex Inc.,* 707 F.3d 417, 426 (3d Cir. 2013). A prima facie case of racial discrimination encompasses four elements: 1) the plaintiff belonged to a protected class; 2) he[6] was qualified for the position in question; 3) he was subject to an adverse employment action; and 4) the adverse action was taken under circumstances giving rise to an inference of discrimination. *Greene v. Virgin Islands Water & Power Auth.,* 557 F. App'x 189, 195 (3d Cir. 2014)[7] (citing *Burton,* 707 F.3d at 426); *accord Shahin v. Delaware,* 543 F. App'x 132, 136 (3d Cir. 2013); *Rodriguez v. Nat'l R.R. Passenger Corp.,* 532 F. App'x 152, 153 (3d Cir. 2013).

**Step 2: *Legitimate non-discriminatory reason for the termination.***

If the plaintiff states a *prima facie* case, the burden of production shifts to the defendant, which must articulate a legitimate basis for the adverse employment action. *Burton,* 707 F.3d at 426; *Rodriguez v. Nat'l R.R. Passenger Corp.,* 532 F. App'x at 153. "This burden is relatively light and is satisfied if the employer provides evidence, which, if true, would permit a conclusion that it took the adverse employment action for a non-discriminatory reason." *Burton,* 707 F.3d at 426 (internal quotations omitted). Indeed, at this stage, "the defendant need not prove that the articulated reason actually motivated its conduct." *Burton,* 707 F.3d at 426 (internal quotations omitted).

**Step 3: *Pretext.*** Once the defendant has offered a non-discriminatory reason, the burden of production shifts back to the plaintiff. Now the plaintiff must present evidence to show that the defendant's stated reason is merely a pretext for discrimination. *Burton,* 707 F.3d at 426. The plaintiff can do that in either of two ways: (1) he can discredit defendant's proffered reason; or (2) he can offer evidence that discrimination was more likely than not a motivating or determinative factor in the adverse action. *Fuentes v. Perskie,* 32 F.3d 759, 764

---

[6]     Because the plaintiff here happens to be male, I will use the male pronoun even when referring to a generic plaintiff.

[7]     All Court of Appeals cases cited to F. App'x are non-precedential.  *See* 3d Cir. IOP 5.3; Fed. R. App. P. 32.1(a).

(3d Cir. 1994). To meet that burden, the plaintiff may rely on direct or circumstantial evidence. *Id.*

If the plaintiff relies on the first method (discrediting the defendant's proffered reasons), he faces a demanding standard: he must present evidence that allows a factfinder "reasonably to infer that each of the employer's proffered non-discriminatory reasons...was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." *Fuentes*, 32 F.3d at 764 (internal quotations and citations omitted). The plaintiff "must show such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." *Iadimarco v. Runyon*, 190 F.3d 151, 166 (3d Cir. 1999).

If the plaintiff relies on the second method (evidence that discrimination was a motivating factor), he can provide the required evidence in at least three ways: "by showing that the employer in the past had subjected him to unlawful discriminatory treatment, that the employer treated other, similarly situated persons not of his protected class more favorably, or that the employer has discriminated against other members of his protected class or other protected categories of persons." *Fuentes*, 32 F.3d at 765.

## B.  *McDonnell-Douglas* standard applied to the evidence

Mr. Ewell has presented various pieces of evidence in support of his claim that NBA Properties discriminated against him. I do not believe his evidence met his step one burden of establishing a prima facie case. Giving the benefit of the doubt, however, I also consider it in connection with step three. I consider each piece of evidence individually, and also, as urged by plaintiff's counsel, consider the overall picture that it paints. Nevertheless, Ewell's

evidence fails to rebut NBA Properties' evidence of its nondiscriminatory reasons for terminating him.

### 1.   NBA Properties' stated reasons for termination

Whether plaintiff's evidence is considered at step one or step three, it is helpful to place it in the context of step two, *i.e.,* NBA Properties' stated reasons for terminating Mr. Ewell.

NBA Properties has offered ample evidence that it terminated Mr. Ewell for legitimate, nondiscriminatory reasons: His conduct at the bar violated the organization's conduct policy, caused him to miss work, put the organization to the expense of bringing in a substitute, and risked bad publicity. Ewell does not dispute that the events in the bar occurred, although he contends that he was not at fault. The evidence is clear that he was intoxicated to some degree, that he argued about his bar tab, and that the situation escalated to the point that he was physically thrown out of the bar. Treated at a hospital until 4 a.m., he missed work in the morning. By his own admission, he was unpresentable and physically unfit to work, and another employee was summoned from New Jersey to substitute for him.

Mr. Ewell has many grounds for complaint which, even if legitimate, would not add up to a discrimination claim. He may believe that the organization was harsh, arbitrary, or even mistaken in dismissing him. He states that the bar altercation was not his fault, and expresses understandable outrage that the bouncers injured him. He may believe that his employer, overly sensitive to bad publicity, would unreasonably have had him pay an inflated bar tab rather than assert his rights. He may believe that his employer should have credited his version of the events, and not drawn adverse inferences from the situation or the statements of other witnesses. Such complaints do not make out a claim under Title VII or the NJLAD: "To discredit the employer's proffered reason ... the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Fuentes,* 32 F.3d at 765.

9

To put it another way, we are not trying an assault case, but a discrimination case. At issue is the employer's basis for terminating Ewell, not the particulars of the altercation in the bar. The employer, correctly or not, could have dismissed Ewell because it considered him to be at fault. Or the employer, wisely or not, could have dismissed Ewell because, whether right or wrong, he placed himself and the NBA in an awkward position. Those might be bad reasons for dismissal, but they are not discriminatory reasons.

Of course, weak reasons for dismissal might suggest an inference that they were not the real reasons. Here, however, the employer's stated reasons for firing Ewell are plausible, especially coming from an image-conscious organization like the NBA. And the circumstances corroborate NBA Properties' claim that its stated reasons were the real ones.

First, Mr. Ewell's termination occurred shortly after the incident in the Boston bar. The altercation occurred on the night of June 9-10, 2010; Ewell missed work the following morning and was quickly replaced by a substitute; and Ewell was terminated two weeks later, on June 24, 2010. (Ewell Dep., 203; Case Dep., 86-87).

Second, the reasons for termination were not concocted after the fact, or in response to a claim of discrimination. Mr. Case's superiors told him that they wanted Ewell terminated because of the incident in the Boston bar. (Case Dep., 97). When Case informed Ewell that he was being fired, he read from a prepared statement that cited Ewell's conduct on June 10, 2010. Ewell does not contend that he ever heard, directly or indirectly, that he was fired for any other reason. Of course, a pretext need not be a *post hoc* fabrication; it could be a contemporaneous fabrication. But NBA Properties' explanation for the termination has at least remained consistent.

Even assuming that Ewell presented a prima facie case, the reasons proffered by NBA Properties easily suffice to put Ewell to the burden of rebutting them.

## 2.   Ewell's evidence of discrimination and pretext

As to both the prima facie case and pretext, Mr. Ewell has presented five categories of evidence: (a) a racist remark; (b) treatment of three similarly situated Caucasian employees; (c) a subsequent reduction in force; (d) evaluations by Ewell's supervisors; and (e) miscellaneous allegations of discrimination against other employees.

### a.   *Racist Remark*

Mr. Ewell's allegations of discrimination focus on Mr. Gliedman:

Q: Who are you claiming discriminated against you because of your race?

A: Michael Gliedman.

Q: Are you claiming that anybody other than Mr. Gliedman discriminated against you because of your race?

A: No.

(Ewell Dep. 75-76)

Some ten years before Ewell's dismissal, Gliedman allegedly made a racial remark to a member of the IT staff. Garth Case, who worked in the IT department as head of customer service, testified about the incident. (Case Dep., 13, 28). Sometime in 1999 or 2000, Case conducted a presentation using Power Point slides. (Case Dep., 30). Some of the slides contained clip art images of stick figures, drawn in black. (Case Dep., 29-32). After the presentation, Gliedman commented to Case that he "felt that there were too many black people in the presentation." (Case Dep., 28). That comment could be interpreted as an ironic jab at racism or political correctness (it is hard to tell which). Alternatively, however, it could be interpreted as a racially insensitive or even racist remark, depending on the context. The Third Circuit has given guidance as to how to evaluate that context:

> When considering whether stray remarks are probative of discrimination, the Court considers three factors: (1) the relationship of the speaker to the employee and within the corporate hierarchy; (2) the purpose and content of the statement; and (3) the temporal proximity of the statement to the adverse employment decision. *Parker v. Verizon Pa., Inc.,* 309 F. App'x 551, 559 (3d Cir. 2009) [not precedential] (citing *Ryder v. Westinghouse*

> *Elec. Corp.*, 128 F.3d 128, 133 (3d Cir. 1997))(holding remarks
> related to plaintiff's restrictions caused by plaintiff's disability did
> not establish pretext because they were made seven months before
> plaintiff's termination).

*Stites v. Alan Ritchey, Inc.*, No. 09-392, 2011 WL 81076 at *8 (E.D. Pa. Jan. 10, 2011) *aff'd*, 458 F. App'x 110 (3d Cir. 2012).

Gliedman, as Chief Information Officer of NBA Properties, was in the supervisory chain above Ewell, and it was Gliedman who made the termination decision. Nevertheless, his remark about the stick figures is entitled to little or no weight.

First, Gliedman's remark was made ten years or more before Ewell's termination in June 2010. Courts have been skeptical of "stray remarks" made far closer to the date of an adverse employment action. In *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992), for example, the Third Circuit reversed a bench-trial verdict, discounting a remark made five years before the adverse employment decision: "The comment's temporal distance from the decision Ezold says was discriminatory convinces us it is too remote and isolated to show independently that unlawful discrimination, rather than Wolf's asserted reason, more likely caused the firm to deny Ezold the partnership she sought in 1988." *Ezold*, 983 F.2d at 545.

In *Stites v. Alan Ritchey, Inc.*, *supra*, a racial discrimination case, the court gave little weight to a remark made a year before plaintiff's termination. There, a non-Asian plaintiff alleged that two of his direct supervisors had made stereotyping remarks praising Asians as efficient, uncomplaining workers. Most relevant here is the *Stites* court's stress on the vintage of the remarks; they were already a year old when plaintiff was fired. 2011 WL 81076 at *8 (citing *Parker, supra* (remarks made more than seven months prior to plaintiff's termination did not establish pretext)). *Stites* granted defendants' motion for summary judgment.

Gliedman's remark, made ten years before Ewell's termination, does not approach the temporal proximity of those found to be too stale in *Ezold, Stites, Parker,* and *Ryder.*

Second, Gliedman's statement appears to have been an isolated or stray remark. Ewell cites no proof of other racially offensive remarks by Gliedman. (Some additional hearsay allegations are discussed at Section II.B.2.e, p. 22, *infra.*) Mr. Case, who had worked for Gliedman continuously through the date of his deposition in November 2013, could recall no others. (Case Dep., 14-15, 19, 40). And Gliedman's remark bore no relation to any employment action, with respect to Ewell or anyone else. (Case Dep., 28, 86-87).

Isolated remarks unrelated to employment decisions, without more, do not make discrimination cases. "We note that stray remarks by decisionmakers, unrelated to the decision-making process, are rarely given weight, particularly if they are made temporally remote from the date of the decision." *Silver v. Am. Inst. of Certified Pub. Accountants*, 212 F. App'x 82, 85 (3d Cir. 2006) (not precedential; citing *Ezold, supra*). At best, such a remark might corroborate other, stronger evidence of discrimination. *See Roebuck v. Drexel Univ.*, 852 F.2d 715, 733 (3d Cir. 1988). As discussed below, however, Mr. Ewell has not produced such other evidence.

Mr. Gliedman's alleged remark is far "too remote and isolated to show independently that unlawful discrimination" existed, or that it caused Ewell's termination. *Fuentes*, 983 F.2d at 545. Still less does it establish that the reasons given by the employer were pretextual.

### b.   *Similarly situated employees*

Mr. Ewell offers evidence that three non-African-American employees—Jack Loughery, Brian Kabus, and David Munoz— engaged in misconduct similar to his, but were not terminated.

An inference of discrimination may arise if similarly situated employees of a different race received more lenient treatment than that afforded plaintiff. *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 645 (3d Cir.

13

1998). The comparison, however, must be apt and clear. "[T]o be considered similarly situated, comparator employees must be similarly situated in all relevant respects." *Wilcher v. Postmaster Gen.*, 441 F. App'x 879, 881-82 (3d Cir. 2011) (citing *Russell v. University of Toledo*, 537 F.3d 596 (6th Cir.2008); *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 259–261 (5th Cir.2009)). Specifically, courts tend to consider whether the plaintiff and the comparator had similar job responsibilities, were subject to the same standards, worked for the same supervisors, and engaged in comparable misconduct. *Wilcher*, 441 F. App'x at 882; *McCullers v. Napolitano*, 427 F. App'x 190, 195 (3d Cir. 2011).

In particular, a court must consider whether the two individuals are similar with respect to the particular basis for plaintiff's termination:

> In determining whether similarly situated nonmembers of a protected class were treated more favorably than a member of the protected class, the focus is on the particular criteria or qualifications identified by the employer as the reason for the adverse action. The employee's positive performance in another category is not relevant and neither is the employee's judgment as to the importance of the stated criterion. Furthermore, the court does not subjectively weigh factors it considers important. Rather, the plaintiff must point to evidence from which a factfinder could reasonably infer that the plaintiff satisfied the criterion identified by the employer or that the employer did not actually rely upon the stated criterion.

*Simpson*, 142 F.3d at 647 (internal citations and quotations omitted). *See also Lowe v. Medco Health Solutions of Willingboro, LLC.*, No. 10-cv-4823, 2012 WL 1495440, at *9 (D.N.J. Apr. 27, 2012) (collecting cases).

The situation of each of the three comparators is dissimilar to that of Ewell in important respects.

### i.     Jack Loughery

The closest potentially comparable case is that of Jack Loughery. In 2008, in connection with a NBA playoff event in San Antonio, Mr. Loughery was assigned to help handle logistical matters, including press credentials.

14

(Ewell Supp. Stmt. ¶ 182). One evening, Loughery was involved in an incident in which he punched two men. Although Loughery was not injured, his supervisors decided to send him home out of fear that the men were affiliated with a gang or might retaliate. (NBA Stmt., ¶ 74). NBA Properties did not, however, further discipline Loughery. (Ewell Supp. Stmt. ¶ 199). Ewell contends that NBA Properties' comparatively lenient treatment of Loughery gives rise to an inference of discrimination with respect to himself. The Loughrey and Ewell incidents, though, differ in important ways.

A critical point of comparison is whether "the two employees dealt with the same supervisor." *McCullers*, 427 F. App'x at 195; *Wilcher*, 441 F. App'x at 882. They did not. Loughery was not a member of the IT department and Gliedman was not his supervisor. (Mot., 19). There is no evidence that Gliedman was involved in the decision whether to punish Loughery, or was even aware of the Loughrey incident. An inconsistency between the decisions of different supervisors in separate departments, even if demonstrated, does not imply that one of them must have discriminated.

In addition, the Court must consider "such differentiating or mitigating circumstances as would distinguish [the two employees'] conduct or the employer's treatment of them." *McCullers*, 427 F. App'x at 195. The police at the scene of Loughery's incident—unlike the policeman who confronted Ewell—concluded that Loughrey had done nothing wrong. (Loughery Dep., 35). Loughery testified that the other men were the instigators, and that he had acted in self-defense. One of the men, Loughery testified, bumped into Loughery and made a lewd remark to his female companion. (Reply Stmt., ¶ 186). The man then challenged Loughery to a fight, "came lunging towards" Loughrey and "was going to hit" him. *Id.* Loughery punched this man, knocking him to the ground. (*Id.* at ¶ 187). Unwisely, the man's friend then charged Loughery and likewise found himself on the ground. *Id.* Ewell argues that he, like Loughrey, did nothing wrong.

15

Loughery faced an aggressive, perhaps unavoidable challenge. Ewell could have prudently avoided his altercation by simply paying the tab, perhaps disputing it later in a neutral setting. Loughery, unlike Ewell, reported the incident to NBA security, human resources, NBA legal, and his unnamed "boss." (Ewell Supp. Stmt. ¶¶ 194-95, 197-98). Ewell did not (although co-workers were present). Both Ewell and Loughery were relieved of further duties at the particular out-of-town event. But Loughery, unlike Ewell, did not render himself unpresentable or unfit for work. He did not sleep in and miss work without excuse. Rather, NBA Properties made a prudential decision to reassign Loughery to steer clear of possible retaliation. A single supervisor at NBA Properties who heard both stories (and there is no evidence that there was such a person) could have seen a rational basis to distinguish between them.[8]

Finally, to say that NBA Properties was precipitate or ill-advised in firing Ewell is not to say that it discriminated. Title VII and NJLAD are not vehicles for challenging employment decisions that are arbitrary, harsh, or even unfair. A plaintiff cannot defeat summary judgment by showing that an employer's decision to terminate him was mistaken or unwise. *Fuentes*, 32 F.3d at 765.

Because Gliedman was not the decision maker in both cases, and because the information possessed by NBA Properties suggests that the cases were distinguishable, I do not conclude that any disparity in the treatment of Ewell and Loughery is evidence of discrimination.

### ii.     Brian Kabus

Mr. Ewell alleges that a second Caucasian employee, Brian Kabus, engaged in conduct comparable to his own, but was not dismissed as a result. Mr. Kabus allegedly "expose[d] his buttocks in thong underwear to employees and non-employees in the atrium of the Courtyard Marriott in Auburn Hills,

---

[8]     NBA Properties also points out that the Loughery incident, unlike the Ewell incident, preceded the 2009 promulgation of the employee code of conduct. I give that little weight; I assume without deciding that NBA Properties, even before 2009, had the authority to dismiss an employee for misconduct.

Michigan." (Ewell Supp. Stmt. ¶ 159).[9] Such horseplay violated any standard of decent employee conduct, but it is not remotely analogous to the Ewell bar incident. It did not cause Kabus to miss work; cause bodily injury to Kabus (or anyone); cost the league money; require reassignment of employees; or disrupt operations at an important league event.

The Kabus and Ewell situations are not comparable. A disparity in how the two were disciplined does not bespeak racial discrimination.

### iii.   David Munoz

Mr. Ewell also points to evidence of misconduct by an NBA employee named David Munoz. Munoz, he says, discharged a fire extinguisher in the hotel room of another NBA employee. (Ewell Supp. Stmt., ¶ 122). The prank was not harmless: it caused damage to the hotel room and put the employee, who suffered from asthma, in danger. (*Id.* at ¶¶ 129, 131, 134). Although NBA Properties was aware of the incident, it did not terminate (or seemingly even discipline) Munoz for it.[10] (Ewell Stmt., ¶¶ 54-56; *see* Case Dep., 64).

Once again, Munoz's conduct, from an employer's point of view, is not so comparable to Ewell's that it raises an inference of discrimination. For all that appears in the record, Munoz's stunt did not cause himself or anyone else to miss work; did not cause NBA Properties to lose money; was not conducted in public view to the detriment of NBA's reputation; and (luckily) did not result in bodily injury. Nor is there evidence that the decision makers in the Munoz and Ewell cases overlapped. Ewell plausibly contends that Munoz's behavior violated NBA employee conduct policies. There is no evidence, however, that NBA Properties has a policy of punishing all infractions with sanctions or termination. Where two individuals have violated the conduct policy in different

---

[9]     Gliedman, who was present, says it was at a barbecue for NBA employees in a grassy area outside of the small hotel or motel where they were staying. (ECF 84-4, at 4) He confirms that he admonished, but did not discipline or fire, Kabus. Kabus was, however, terminated in 2008, apparently on other grounds. (Chandler Dec. ¶ 23)

[10]     As it happened, however, the NBA terminated Munoz in 2009, on other grounds. (Chandler Dec. ¶ 15)

ways, an employer has the discretion to conclude that one was guilty of a more serious infraction than the other, and to treat the cases accordingly.

        c.     *2011 Reduction in force ("RIF")*

Mr. Ewell alleges that, approximately a year after his termination, NBA Properties undertook an across-the-board reduction in force ("RIF") that disproportionately affected African American employees in the IT department.[11] (Compl. ¶ 20). In discovery, NBA Properties provided Ewell with a list of all employees of the IT department as of June 1, 2010 (*i.e.*, at about the time of Ewell's dismissal, and about a year before the RIF). Of the 86 employees on the list, 21 (about 25%) are listed as "Black/African American." (Employee List). John Rios, an employee of the IT department, was asked to identify any employees on the list who were laid off during the 2011 RIF. (Rios Dep., 68). From memory, Rios identified 11. (Rios Dep., 68-69).[12] Of those 11, 5 (about 45%) were African American. Mr. Ewell argues that this was disproportionate: African Americans constituted about 25% of the department, but accounted for

---

[11]    At oral argument, counsel for NBA Properties clarified that the RIF did not affect only the IT department. It was part of a broader reduction, precipitated by the player lockout and shortened season of 2011.

    If company-wide, the RIF is less likely to have been a mere vehicle for Gliedman, the relevant decision maker in the IT department, to discriminate. I do not rely on the lack of supervisory overlap, however, because it is not critical to my reasoning. The evidence is equivocal as to whether Gliedman, the decision maker with respect to Ewell's termination, also made the decisions as to the RIF within the IT group. (Case Dep., 13). In his brief, Ewell says that Gliedman was "the decision-maker during the RIF." (Ewell Brief, 6). In support, however, he cites only the deposition of Mr. Rios. There, Rios testified that Gliedman had general hiring and firing power, not that he made the RIF decisions. (Rios Dep., 63). Indeed, Rios had no knowledge about how individuals were selected for termination during the RIF. (Rios Dep., 63-64). Gliedman testified that, in connection with the RIF, he made "value assessments." (Ewell Supp. Stmt ¶ 107 (citing Dkt. No. 88, 59:8-10) That statement was not explored in the deposition; I cannot tell whether it means Gliedman made recommendations, decisions, or something else. Counsel for NBA Properties acknowledged at oral argument that Gliedman was "involved" in the RIF.

[12]    Gliedman estimated that 12 employees were terminated. (Dkt. No. 88). I will construe the facts in the light most favorable to Ewell and assume that the actual number was 11.

45% of the RIF terminations. For the reasons stated below, I do not find this to be significant evidence of discrimination against Ewell.

First and most fundamental is the absence of any information about the basis on which employees were selected for termination in the RIF. Virtually all of our information about the RIF comes from the recollection of Mr. Rios. But Rios admittedly knew nothing about the selection process. (Rios Dep., 63). There is no evidence, even of the anecdotal variety, that the RIF was executed on a racial basis. Non-racial factors that could account for the selection—for example job performance, or hiring date—are not explored.

To put the argument in statistical terms, there is no basis for assuming that the 11 terminated employees were, or were even intended to be, a random sample of the population of 86. *See* Wolfram MathWorld, *http://mathworld.wolfram.com/Sample.html* (sample and population defined). If the sample was not random, we cannot draw valid statistical conclusions.[13]

---

[13]     To put it another way: The unspoken assumption underlying Ewell's argument seems to be that, to be *race-neutral*, the selection of employees for RIF needed to be *random*. He infers discrimination based on the sample's deviation from what would be expected if it were truly random. But Ewell's assumption is unwarranted; selection need not have been random to be permissible. Indeed, the selection would be permissible if conducted on virtually any basis other than race (or another forbidden constitutional or statutory category).

Selection on bases other than race may skew the racial distribution for reasons having nothing to do with discrimination. Were all of the 86 employees equally likely to be terminated on grounds other than race? Perhaps dismissals were based on employee evaluations. Or perhaps help desk technicians were more valuable to the company, and therefore less likely to be terminated, than computer programmers (or vice versa). If the sample of 11 was not random, then a simple percentage comparison between the population of 86 employees and the sample of 11 loses its significance as a measure of racial discrimination. *See See* Ramona L. Paetzold and Steve L. Willborn, *The Statistics of Discrimination*, § 4:11.

My point is not that we should speculate as to the employer's basis for selecting employees for the RIF. Nor do I suggest that a *valid* statistical analysis would not constitute relevant evidence of discrimination. But we cannot perform such an analysis, because the necessary facts were not elicited. The basis for the RIF is not explored at all in Ewell's skimpy presentation, which is based on the anecdotal recollections of one witness. In short, these statistics do not disprove the race-neutrality of the RIF, and certainly do not rebut NBA Properties' neutral explanation for Ewell's termination a year earlier.

For the disparity here to create (or contribute to) a material issue of fact, it would have to be accompanied by some additional statistical analysis, by additional evidence that race influenced the RIF process, or by evidence that the employer's stated criteria in executing the RIF were sham criteria. Such evidence is missing here; indeed, we do not even know what the employer's stated criteria were. Without such information, a numerical disparity has no significance, because the sample of 11 cannot be evaluated as if it were a random sample.

Second, the number of terminations and the size of the department are small enough that percentages can sound more impressive than they are. The sample size is very small. Each of the 11 terminated employees accounted for 9% of the sample. Had there been 3, rather than 5, African American employees among the 11, the racial breakdown of the sample and the population would have correlated as closely as is mathematically possible (27% terminated compared to 25% department-wide).

Thus, for example, in *Mayor of City of Philadelphia v. Educ. Equal. League*, 415 U.S. 605, 621 (1974), the plaintiffs claimed that the membership of an appointed 13-member panel did not reflect the racial makeup of the city. The district court's opinion rejected just the kind of simplistic statistical approach that Ewell suggests here:

> [The district court] held that differences between the percentage of Negroes in the city's population (34%) or in the student body of the public school system (60%) and the percentage of Negroes on the 1971 Nominating Panel (15%) had no significance. In large part, this was because the number of positions on the Panel was too small to provide a reliable sample; the addition or subtraction of a single Negro meant an 8% change in racial composition.

*Id.* at 611 (citations omitted). And the Supreme Court agreed. It upheld the district court's reasoning on a number of grounds, finding, *inter alia,* that its "concern for the smallness of the sample presented by the 13-member Panel

was also well founded." *Id.* at 621.[14] The case is not factually on point, of course, but I am guided by the concerns expressed by the Court.

Finally, the relevance of the RIF is at best indirect; Ewell himself was not affected by the RIF, which occurred a year after he was terminated. This across-the-board RIF in 2011, offered to show general discriminatory intent, may not shed much light on an individual, misconduct-based termination in 2010.

In short, this evidence would be very unpersuasive if the terminated employees had hypothetically brought a claim of discrimination on behalf of themselves. As indirect evidence that Ewell's dismissal was discriminatory, it has virtually no value at all.

Ewell offers only raw numbers concerning a RIF dating from a year after his own dismissal on disciplinary grounds. Even assuming disparate impact, those numbers, standing alone, do not create a material issue of fact as to discrimination in general—let alone discrimination with respect to Ewell himself.

---

[14]     This small sample (11) is drawn from a small population (86). Even assuming that the sampling is perfectly random, small samples from small populations may yield misleading or even spurious results. *See* Ramona L. Paetzold and Steve L. Willborn, *The Statistics of Discrimination* § 6:15 (Noting that "[i]n general, the plaintiff will prefer to have the relevant population as large as possible, since a large sample size is more likely to produce statistically significant coefficients (some of which may be due to actual discrimination; some of which may be spurious).").

Whether the distribution of some characteristic in a truly random sample will match that of the population from which it is drawn is a matter of probability. The bigger the random sample, the more likely it is to match the population (and a sample consisting of 100% of the population will obviously match it exactly). The smaller the sample, the greater the probability that it will deviate from the population. In the IT department, the probability of a randomly selected person's being African-American is 21/86, or about 25%. Where p=.25, the probability of an 11-person random sample containing 5 or more African-Americans is about 11%. (These rough figures were obtained using an online binomial calculator.)  But, as I say, the assumption underlying the calculation—that the sample was, or was even intended to be, random—cannot be demonstrated from this record. *A fortiori,* we cannot calculate a confidence interval.

### d.   Evaluations by direct supervisor

Mr. Ewell points to positive performance reviews from his direct supervisor, Garth Case. (Ewell Brief, 3). Mr. Case did indeed testify that he thought Ewell was doing a good job, and said that he "disagreed wholeheartedly" with the decision to terminate Ewell. (Case Dep., 99). Case also testified, however, that he did not believe race played a role in the decision to fire Ewell. (*Id.* at 100)

In a case like this one, positive performance evaluations are not significant. Where the employer has given a non-discriminatory reason for firing, "[t]he employee's positive performance in another category is not relevant." *Simpson*, 142 F.3d at 647. NBA Properties does not claim to have fired Ewell because of general poor performance. They say they fired him because of a well-documented, specific instance of poor judgment. Evidence that Ewell generally did a good job might be used to cast doubt on the defendants' judgment, but as proof of discrimination it is inadequate. To show pretext, a plaintiff "must show such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." *Iadimarco*, 190 F.3d at 166. Generally positive evaluations come nowhere near casting that kind of doubt on NBA Properties' stated reasons for termination.

### e.   Miscellaneous allegations regarding other employees.

Mr. Ewell briefly cites several other alleged instances of discrimination. The evidence in the record, however, does little, if anything, to support an inference of discrimination. For the most part, Ewell attempts to buttress his own say-so with more say-so.

First, Ewell alleges that certain African American employees were not promoted to higher positions within the NBA. He names five: Joanna Porter (*See* Ewell Suppl. Stmt. ¶ 99), Michael Shockley (*Id.* at ¶ 81), Natasha Cherry

(*Id.* at 83), Indira Murphy (Opp., 5), and Vernette Mboya (Opp., 5). But Ewell offers no evidence that race played a role in those non-promotions; he simply says that it did. *See* Ewell Suppl. Stmt. ¶¶ 80, 82, 84, 89. Mr. Case testified that four of the five never told him they believed they were passed over for promotion because of their race. (Case Dep., 105-06, 111). (As to the fifth, Case had no recollection either way.) (*Id.* at 114-115). For all that appears in this record, Ewell is officiously claiming discrimination on behalf of persons who never themselves complained of it.

A sixth African American employee, Nigel Hewitt, allegedly did complaint of discrimination, but Ewell's evidence is second-hand. Case testified that Hewitt told him that he thought Gliedman had declined to promote him for racial reasons. No direct testimony from Hewitt appears in the summary judgment record.

At any rate, Hewitt's complaint has little evidentiary value. Ewell provides no context about the missed promotion. Was Hewitt qualified for the job? Was the job given to a less qualified person of another race? Ewell offers nothing from which discrimination can be inferred.

Ewell points to Case's testimony that a Caucasian woman was hired from outside the organization to fill a vacancy for which two African American employees were qualified. (Case Dep., 129-130). Case's testimony, though, goes no farther than that. Case did not testify that the person ultimately hired was less qualified than the two African American employees. Nor did he testify that the reason for hiring an outside employee was racial. His testimony therefore does not support a finding of race discrimination. Here again, both the alleged perpetrator and the supposed victims are silent, and the third party witness neither alleges nor offers evidence of discrimination.

Ewell offers second-hand testimony that Gliedman made remarks with racial overtones. Gabe Rein, an African American employee, allegedly told Case that Gliedman had referred to Rein's attire as "hip-hop or hood." (Case Dep., 117). Hewitt, too, allegedly told Case that Gliedman had made a disapproving remark about a jacket he wore displaying the name of a hip-hop group. A

23

supervisor may, of course, enforce the company's standards of dress, and the standards should be explained clearly. Such comments need not, and perhaps should not, stray into some sort of cultural critique. But without some additional context, these stray remarks (assuming from these hearsay reports that they occurred) do not tend to suggest that Ewell's dismissal was racially based.

Ewell also contends that Gliedman once sent an employee "disrespectful" emails, and "did not know how to talk to" another employee. (Ewell Supp. Stmt. ¶¶ 73, 77). Mr. Case generally confirmed that there had been a disrespectful email exchange, but only Ewell offered the second-hand impression that the emails or conversations had a "racial component." (*Id.* ¶¶ 75, 78). There is no further description of the emails, and no further evidence relating to them. Such conclusory allegations cannot defeat summary judgment. *See Ridgewood*, 172 F.3d at 252.

In short, these miscellaneous allegations about discrimination against other employees are scattered, inconclusive, and generally unsupported by testimony from the employees themselves.

*     *     *

I have necessarily discussed Mr. Ewell's contentions one at a time, when it is the entire picture that he wishes us to see. But insubstantial or unsupported allegations do not gain weight by virtue of their number. Even taking the overall view, I cannot find substantial evidence that Mr. Ewell was terminated under circumstances giving rise to an inference of discrimination. Nor does Ewell present evidence from which a reasonable jury could either find NBA Properties' nondiscriminatory reason for terminating him to be a pretext, or conclude that discrimination was a motivating or determinative factor.

The defendants' motion for summary judgment as to the first and third counts of the Complaint is therefore GRANTED.

24

## II.    Retaliation Claims

The second and fourth counts of the complaint allege retaliation in violation of Title VII and NJLAD. Mr. Ewell alleges that he reported incidents of discrimination to NBA Properties during the course of his employment. NBA Properties, he says, retaliated through various acts that culminated in his termination. (Compl., ¶ 49, 67).

Courts use the *McDonnell Douglas* framework to analyze retaliation claims under both the NJLAD and Title VII. *Lewis v. Cablevision Sys. Corp.*, No. 08-cv-2793, 2010 WL 1133872, at *9 (D.N.J. Mar. 22, 2010); *Mancuso v. City of Atl. City*, 193 F. Supp. 2d 789, 811 (D.N.J. 2002). To state a prima facie case of retaliation, the plaintiff must show that "(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action." *Moore v. City of Philadelphia*, 461 F.3d 331, 340-41 (3d Cir. 2006) (as amended Sept. 13, 2006).

Mr. Ewell has failed to present any evidence of a causal connection between any alleged protected activity and his termination. He states that sometime in the 1990s he "probably did" mention to an NBA representative that he thought he received a negative performance review because of his race. (Ewell Stmt., ¶ 75). He generally alleges that he complained to Mr. Case "multiple times" about discrimination. He offers no specifics. And he fails to produce any evidence that connects any complaints he made to any retaliatory actions, including his termination.

Even if I were to conclude that Mr. Ewell had stated a prima facie case, I would have to conclude that he has failed to rebut NBA Properties' stated nondiscriminatory reasons for his termination. *See* Part I, *supra*. These generalities simply do not create a genuine material issue of fact for trial.

Defendants' motion for summary judgment as to the second and fourth counts of the complaint is therefore GRANTED.

### III.    State-Law Tort Claims (IIED and NIED)

Finally, the fifth and sixth counts of the complaint allege the state law torts of intentional infliction of emotional distress ("IIED") and negligent infliction of emotional distress ("NIED"). As to these torts, which arise from the same facts as the discrimination claims, judgment must be entered in favor of the defendants.

To establish IIED under New Jersey law, a plaintiff must allege "intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe." To establish NIED, the plaintiff must demonstrate that: "(a) defendant owed a duty of reasonable care to plaintiff; (b) defendant breached that duty; (c) plaintiff suffered severe emotional distress; and (d) defendant's breach of duty was the proximate cause of the injury." *Dello Russo v. Nagel*, 817 A.2d 426, 435 (App. Div. 2003).

To begin with, Mr. Ewell fails to demonstrate that he suffered severe emotional distress. For a claim of IIED, "the emotional distress suffered by the plaintiff must be so severe that no reasonable [person] could be expected to endure it." *Taylor*, 706 A.2d at 696 (internal quotations omitted). The distress "must be sufficiently substantial to result in either physical illness or serious psychological sequelae." *Turner v. Wong*, 832 A.2d 340, 348 (N.J. App. Div. 2003). For a claim of NIED, "it must be reasonably foreseeable that the tortious conduct will cause genuine and substantial emotional distress or mental harm to average persons." *McDougall v. Lamm*, 48 A.3d 312, 319 (N.J. 2012).

In deposition, Mr. Ewell testified that he "occasionally tears up," has experienced some "sleepless nights," and suffers from a "low level stress disorder." These symptoms do not rise to the required level of emotional distress.

In addition, Ewell's firing does not constitute the kind of extreme conduct that will give rise to an IIED claim:

> [I]t is extremely rare to find conduct in the employment context
> that will rise to the level of outrageousness necessary to provide a

basis for recovery for the tort of intentional infliction of emotional distress." *Cox v. Keystone Carbon Co.*, 861 F.2d 390, 395 (3d Cir. 1988), *cert. denied*, 498 U.S. 811, 111 S.Ct. 47, 112 L.Ed.2d 23 (1990); *see also  GTE Southwest, Inc. v. Bruce*, 998 S.W.2d 605, 612-13 (Tex. 1999); " '[W]hile loss of employment is unfortunate and unquestionably causes hardship, often severe, it is a common event' and cannot provide a basis for recovery for infliction of emotional distress." *Cox, supra*, 861 F.2d at 395 (quoting *Brieck v. Harbison-Walker Refractories*, 624 F.Supp. 363, 367 (W.D. Pa. 1985), *aff'd in relevant part*, 822 F.2d 52 (3d Cir. 1987)).

*Griffin v. Tops Appliance City, Inc.*, 766 A.2d 292, 297 (N.J. Super. App. Div. 2001); *accord Catullo v. Liberty Mut. Group, Inc.*, 2012 WL 762163 at *9 (D.N.J. Mar 6, 2012); *Jewett v. IDT Corp.*, 2008 WL 508486 at *4 (D.N.J. February 20, 2008). As for NIED, most cases have required a demonstration of physical injury to corroborate plaintiff's claims of emotional harm. The cases have made an exception for the kind of shocking conduct—severe injury to a close relative, mishandling of a corpse—that indisputably would cause severe distress.[15] In Ewell's case, however, contains no evidence of either physical injury or shocking conduct.

Finally, Mr. Ewell's tort claims rest on allegations of discrimination that have now been rejected. *See* Parts I & II, *supra*. They thus run afoul of the principle that emotional distress cannot be used "to circumvent the required elements of or defenses applicable to another cause of action that directly governs a particular form of conduct." *Griffin, supra.*

---

[15]     *See Decker v. Princeton Packet, Inc.*, 561 A.2d 1122, 1128 (N.J. 1989) (stating that emotional distress cases have evolved "from denying recovery unless the emotional distress is accompanied by physical impact [to the plaintiff], to permitting recovery if the emotional distress results in physical injury [to the plaintiff]," and, finally, to permitting recovery "even in the absence of physical injury," but only under certain conditions). *Portee v. Jafee*, 417 A.2d 521 (N.J. 1980), for example, authorized a NIED claim under the following conditions: "(1) the death or serious physical injury of another caused by defendant's negligence; (2) a marital or intimate, familial relationship between plaintiff and the injured person; (3) observation of the death or injury at the scene of the accident; and (4) resulting severe emotional distress." *Id.* at 528; *See also Strachan v. John F. Kennedy Memorial Hosp.*, 538 A.2d 346 (N.J. 1988) (permitting parents' mental distress claim against hospital for mishandling of son's corpse despite inability to establish *Portee* requirements 1 and 3).

Defendants' motions for summary judgment as to the fifth and sixth counts of the complaint will therefore be GRANTED.

## CONCLUSION

For the reasons stated above, defendants' motion for summary judgment is GRANTED. A separate order will be issued, and judgment will be entered in favor of the defendants.

Dated: March 23, 2015

**KEVIN MCNULTY**
**United States District Judge**

28